
NOT FOR PUBLICATION

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: | BAP Nos.   CC-18-1158-FKuTa |
| | CC-18-1163-FKuTa |
| DARIN DAVIS, | (Related appeals) |
| Debtor. | Bk. No.   1:10-bk-17214-VK |
| ASPHALT PROFESSIONALS, INC., | Adv. Pro.   1:10-ap-01354-VK |
| Appellant, | |
| v. | **MEMORANDUM**<sup>*</sup> |
| DARIN DAVIS, | |
| Appellee. | |

Argued and Submitted on January 24, 2019
at Pasadena, California

Filed – January 31, 2019

Appeal from the United States Bankruptcy Court
for the Central District of California

---

*  This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential value, *see* 9th Cir. BAP Rule 8024-1.

Honorable Victoria S. Kaufman, Bankruptcy Judge, Presiding

———

Appearances:    Ray B. Bowen, Jr. argued on behalf of appellant Asphalt
                Professionals, Inc.; Alan Wayne Forsley of Fredman
                Lieberman Pearl LLP argued on behalf of appellee Darin
                Davis.

———

Before: FARIS, KURTZ, and TAYLOR, Bankruptcy Judges.

## INTRODUCTION

Chapter 7[1] debtor Darin Davis and creditor Asphalt Professionals,

Inc. ("API") have been entangled in litigation in state court since 2005.

After two trials in state court and two trials in the bankruptcy court, the

bankruptcy court adjudicated API's §§ 727(a) and 523(a) claims in favor of

Mr. Davis. API argues on appeal that the bankruptcy court deprived it of

due process, improperly relitigated issues already decided by the state

court, and made erroneous factual findings.

We discern no error and AFFIRM.

---

[1] Unless specified otherwise, all chapter and section references are to the
Bankruptcy Code, 11 U.S.C. §§ 101-1532.

# FACTUAL BACKGROUND[2]

## A.    Mr. Davis' entities and development projects

### 1.    The Whitman Project

Mr. Davis was a developer of small real estate projects through various limited liability companies that he formed with other investors. He personally held a general builder contractor's license, but his LLCs did not possess any such license. (The state license board was not authorized to issue contractor's licenses to LLCs during the relevant time periods.) Instead, his LLCs developed projects as "owner-builders," and he associated his personal contractor's license with each project.

Mr. Davis and a partner formed T.O. IX, LLC ("T.O.") to develop the "Whitman Project," which consisted of nine homes in Thousand Oaks, California. Mr. Davis obtained building permits for the Whitman Project using his personal contractor's license number.

API is a general engineering contractor that builds roads, streets, and sidewalks. T.O. and API entered into a construction subcontract agreement ("Subcontract") for work on the Whitman Project. The Subcontract identified T.O. as the "owner/builder" of the Whitman Project but did not disclose a contractor's license number for either T.O. or Mr. Davis. Later, a

---

[2] We borrow from the bankruptcy court's detailed rulings. We also exercise our discretion to review the bankruptcy court's docket, as appropriate. *See Woods & Erickson, LLP v. Leonard (In re AVI, Inc.)*, 389 B.R. 721, 725 n.2 (9th Cir. BAP 2008).

3

project manager for D&S Homes, Inc. ("D&S Homes"),[3] provided API with Mr. Davis' contractor's license number. API did not verify whether T.O. held a valid contractor's license.

API was responsible for altering a median on a public roadway. It was forced to stop work when it discovered a problem with the site plans that would have resulted in a safety hazard. API then realized that the original site plan was based on a thirty-three-year-old as-built survey. API refused to continue work until D&S Homes updated the site plan or paid API to do so.

In April 2005, D&S Homes told API that it had violated the terms of the Subcontract and terminated the agreement. T.O. back-charged API $80,000 for the cost of another subcontractor to complete the street.

## 2. Licensing violations

In April 2004, the California State License Board ("CSLB") cited another of Mr. Davis' LLCs for work on another development project. Mr. Davis then learned that the "owner/builder" exception only applied to projects with four homes or fewer and that a licensed contractor was required for larger projects.

The Whitman Project included nine homes, and T.O. was an LLC which, at the time, could not hold a contractor's license. Mr. Davis

---

[3] D&S Homes owned sixty percent of T.O. It appears that D&S Homes was the primary point of contact on the Whitman Project.

attempted to remedy the licensing issue by forming another company, Fairland Construction, Inc., to act as T.O.'s management company and obtain a contractor's license.

Mr. Davis believed that he had solved the licensing problem; but in July 2007, CSLB issued citations to T.O. for its lack of a contractor's license.

## B. The state court litigation

In September 2005, API sued T.O., Mr. Davis, and others in state court (the "State Court Action") for breach of contract, foreclosure on a mechanic's lien, fraud, conspiracy, and quantum meruit.

## C. Mr. Davis' bankruptcy case

In June 2010, before API's claims went to trial in the State Court Action, Mr. Davis filed a chapter 7 petition. API filed a timely adversary complaint seeking a denial of Mr. Davis' discharge under §§ 727(a)(2)(A), (a)(2)(B), and (a)(4), and a determination that the debt arising from the Subcontract was nondischargeable under § 523(a)(2)(A).

With regard to § 727, API alleged that Mr. Davis made false and misleading statements concerning his assets in his bankruptcy schedules and statement of financial affairs, including the value and ownership of real property and his involvement and investment in various corporate entities.

With regard to § 523, API asserted that Mr. Davis made false and misleading representations and omissions to deceive and induce API to

5

enter into the Subcontract. It claimed that, had it known that T.O. was not a licensed contractor or that the site plan was inaccurate, it would not have entered into the Subcontract.

In September 2010, the bankruptcy court granted API relief from the automatic stay to allow it to litigate its claims in the State Court Action and potentially establish a basis for issue preclusion.

**D.     The state court trials and appeals**

The state court trifurcated the State Court Action into Phase One (breach of contract, foreclosure on a mechanic's lien, and quantum meruit), Phase Two (alter ego), and Phase Three (fraud and punitive damages). The state court held a bench trial as to Phase One and entered a judgment ("Phase One Judgment") in favor of API in October 2010. It held that:

> (a) plaintiff did everything it was supposed to do under the contract; (b) plaintiff did nothing wrong in their [sic] dealings with the defendants . . . [and] (h) the withholding of payments due the plaintiff under the contract by defendants was not done in good faith[.]

It awarded API $318,000 in damages and $1.65 million in attorneys' fees.

T.O. appealed the award of fees. The Court of Appeal affirmed.

The state court next tried the alter ego issues in Phase Two. In December 2011, the state court ruled that T.O. failed to disclose to API the entities involved in the Subcontract and that T.O. failed to disclose that it was not a licensed contractor. It also found that T.O., D&S Homes, and

6

others were alter egos of Mr. Davis and were jointly and severally liable to API.

The state court entered judgment in favor of API ("Phase Two Judgment"). Mr. Davis and T.O. appealed the Phase Two Judgment, but the Court of Appeal affirmed in all relevant respects.

In 2013, API filed an acknowledgment that Mr. Davis and others had paid in full the Phase One Judgment and associated attorneys' fees.

## E.   API's proof of claim

In January 2011, API filed a proof of claim totaling $3 million. The bankruptcy court disallowed the $1.9 million that had been paid on the Phase One Judgment but allowed the remaining $1.1 million pending the outcome of Phase Three in the State Court Action.

## F.   The § 727(a) trial

In September 2014, the bankruptcy court bifurcated the § 727 claims from the § 523 claims. The next month, it stayed litigation of the § 523 claims pending the outcome of Phase Three in the State Court Action.

In December 2014, the court held a trial on API's § 727(a) claims ("§ 727 Trial"). Several aspects of the trial are contested in this appeal.

During Mr. Davis' cross-examination testimony, his counsel referred to Exhibit G, which was apparently D&S Homes' balance sheet for 2007. API's counsel objected, but Mr. Davis' counsel argued that Exhibit G could be used to refresh Mr. Davis' recollection. The court allowed the

questioning, and counsel never tried to move Exhibit G into evidence.

API argued that § 727(a)(2) applied to the prepetition issuance of 999,000 shares of stock in D&S Homes (valued at $1 per share) to the Leon Family Trust ("Leon Trust") to satisfy (in part) an outstanding debt. As a result, the equity interests of Mr. Davis and other existing shareholders were diluted; Mr. Davis' interest in D&S Homes decreased from twenty-eight percent to 0.03 percent. API produced D&S Homes minutes showing that the board approved the issuance of the shares at a meeting on September 10, 2009. However, Mr. Davis testified that the board had intended that the issuance occur in January 2008. (The date is important because § 727(a)(2)(A) only applies to transactions in the year preceding the bankruptcy filing.)

Another issue concerned the disposition of real property located on Valerio Street in Canoga Park, California (the "Valerio Street Property"). The property was purchased by Canoga Commercial, LLC ("Canoga") in 2008. Mr. Davis was the sole member of Canoga. Shortly before Mr. Davis filed his petition, Canoga borrowed approximately $70,000 from Mr. Davis' mother, secured by a deed of trust on the Valerio Street Property. Postpetition, Canoga borrowed an additional $600,000 from other lenders, also secured by the Valerio Street Property; it later sold the property for $775,000 and used the sale proceeds to pay some of its debts.

The parties also argued about Mr. Davis' representations and

8

omissions as to his interests in his various companies and their assets. API attempted to establish that Mr. Davis misrepresented the value of his business interests (as "$0.00" in his initial schedules and "unknown" in his amended schedules) and failed to disclose the sale of the Valerio Street Property.

Additionally, Mr. Davis did not disclose his prepetition sale of real property in Arizona (the "Arizona Property"). He only amended his statement of financial affairs to disclose the sale after API questioned him about the sale at his deposition.

## G. The § 727 decision and judgment

On December 5, 2014, the bankruptcy court issued its decision in Mr. Davis' favor on all § 727(a) claims.

### 1. Prepetition transfers

As to prepetition transfers under § 727(a)(2)(A), the bankruptcy court held that API failed to show that Mr. Davis transferred, removed, or destroyed property of the debtor when D&S Homes issued stock to the Leon Trust. The court also rejected API's argument that the dilution was intended to hinder, delay, or defraud creditors, instead finding that Mr. Davis had guaranteed the loan from the Leon Trust and that reducing D&S Homes' debt reduced Mr. Davis' exposure on his guaranty.

The court was unconvinced that the transfer of the Valerio Street Property was relevant to § 727(a)(2)(A), because the property belonged to

9

Canoga, not Mr. Davis. The court also found that Mr. Davis did not have an intent to hinder, delay, or defraud creditors, because the proceeds of the loan were used to pay off a prior loan to Canoga.

### 2.    Postpetition transfers

As to postpetition transfers under § 727(a)(2)(B), the bankruptcy court held that the postpetition deeds of trust and the 2014 sale of Canoga's Valerio Street Property did not implicate estate property. Even though Mr. Davis held a 100 percent interest in Canoga, the court held that "in light of all of the circumstances," Mr. Davis did not intend to hinder, delay or defraud his creditors.

### 3.    False oath

Regarding API's claim of false oath under § 727(a)(4), the bankruptcy court ruled that Mr. Davis did not make false statements; and even if he did, they were not made knowingly and fraudulently.

The court found that Mr. Davis did not misrepresent the value of his interest in his business entities. The court held that API did not present any evidence that his valuations were false or prove that Mr. Davis had a fraudulent intent.

The court also found that API failed to prove a false oath arising from Mr. Davis' nondisclosure of the prepetition dilution of his equity interest in D&S Homes. It said that Mr. Davis thought that the stock issuance was intended to have taken place in 2008: "As a result, Debtor believed he did

10

not have to disclose the dilution." The court found that API failed to demonstrate "that the omission was intentional, as opposed to a mistake."

The bankruptcy court found that Mr. Davis did not conceal the sale of the Arizona Property. Although he initially did not disclose the sale or the proceeds, he disclosed the sale two months prior to the final meeting of creditors. The court also found that Mr. Davis lacked the requisite intent.

In conclusion, the court ruled that API established inconsistencies and omissions, but "such mistakes and omissions, without additional facts that would specifically show the required intent, do[ ] not warrant a denial of Debtor's discharge under § 727." The bankruptcy court entered judgment in favor of Mr. Davis (the "§ 727 Judgment").[4]

## H.    The § 523(a) trial

Seven years after the petition date, Phase Three of the State Court Action had still not gone to trial. In 2017, the bankruptcy court informed the parties that it would no longer stay the adversary proceeding. It held a trial on API's § 523(a) claims ("§ 523 Trial") in April 2018.

The court heard testimony from Mr. Davis, as well as Jeffrey Ludlow, (API's president and CEO), Matthew Ludlow (API's vice-president of operations), and Michael Poles (API's expert witness on construction and

---

[4] API immediately appealed the § 727 Judgment. However, the BAP motions panel determined that the judgment was interlocutory because it did not dispose of the entire adversary proceeding and dismissed the appeal.

contracting). In general, Mr. Davis maintained that he did not misrepresent the Whitman Project or his entities and did not know about any problems with the survey. Conversely, the Ludlows testified that API would not have entered into the Subcontract had they known that T.O. was operating as an unlicensed contractor or that the site plans were incorrect.

Mr. Poles testified that it was his opinion that Mr. Davis had acted fraudulently and had a fraudulent intent. The court allowed his testimony over objection but said that it would consider what weight to give that testimony.

Mr. Poles further opined that it was normal and customary for API to not question T.O.'s license status. He stated that a subcontractor that questioned the general contractor's license would not get the job.

I.    **The § 523 decision and judgment**

The bankruptcy court ruled in Mr. Davis' favor, concluding that API had failed to establish any element of the § 523(a)(2)(A) claim.

1.    **False representation, omission, or deceptive conduct**

The bankruptcy court ruled that API did not present sufficient evidence that Mr. Davis' omission regarding T.O.'s license status was fraudulent. It found that: Mr. Davis never communicated directly with API regarding the status of T.O.'s license; the parties agreed at trial that, under California law at the time of the Subcontract, an LLC could not hold a contractor's license in California; Mr. Davis believed that T.O. could

12

lawfully operate as an owner-builder; API had an opportunity to verify T.O.'s license status independently but chose not to; and the Ludlows' testimony that API would not have entered into the Subcontract had they known T.O. was unlicensed was not credible.

The court additionally ruled that Mr. Davis' omissions regarding the site plan were not fraudulent. It found credible his testimony that he did not know the age of the survey or understand its importance. It noted that API could have discussed the age of the as-built survey with T.O.'s architect but did not do so.

The bankruptcy court also found that API did not prove that Mr. Davis engaged in deceptive conduct because he did not act in any way to give API the impression that T.O. had a contractor's license.

## 2. Knowledge of falsity or intent to deceive

The bankruptcy court found that API did not establish that Mr. Davis knew that nondisclosure of T.O.'s license status was wrongful. The court credited Mr. Davis' testimony that he believed it was unnecessary for T.O. to have a contractor's license because the Whitman Project was being built by an "owner/builder," and his personal contractor's license would suffice.

Moreover, the court found that API did not prove that Mr. Davis' omission of T.O.'s status was motivated by an intent to deceive API. The court rejected API's use of expert testimony to establish Mr. Davis' intent.

The court held that API also did not establish that Mr. Davis knew

that his nondisclosure of the age of the as-built survey was wrongful.

### 3. Justifiable reliance

Finally, the bankruptcy court held that API's reliance regarding T.O.'s license was not justifiable because it ignored numerous red flags and its witnesses' testimony was not credible. It held that the Ludlows were sophisticated, experienced construction professionals who reviewed the Subcontract at length and accepted the Subcontract even though it did not identify a contractor's license for either T.O. or Mr. Davis.

The bankruptcy court again found Mr. Poles' testimony not credible, where he testified that a subcontractor would risk losing its bid if it questioned the license status of its general contractor. Mr. Poles and Matthew Ludlow admitted that anyone could inquire with CSLB to verify the status of a contractor's license without alerting the general contractor.

The bankruptcy court entered a judgment in favor of Mr. Davis ("§ 523 Judgment"). API timely appealed from the § 523 Judgment and the § 727 Judgment.

## JURISDICTION

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(I) and (J). We have jurisdiction under 28 U.S.C. § 158.

## ISSUES

(1) Whether the bankruptcy court erred in holding that API did not carry its burden of proof under §§ 727(a)(2)(A), (a)(2)(B), and (a)(4) to deny

14

Mr. Davis his discharge.

(2) Whether the bankruptcy court erred in holding that API did not carry its burden of proof under § 523(a)(2) to deny discharge of its claim.

**STANDARDS OF REVIEW**

In an action for denial of discharge under § 727, we review: (1) the bankruptcy court's legal conclusions de novo, (2) factual findings for clear error, and (3) mixed questions of law and fact de novo. *Searles v. Riley (In re Searles)*, 317 B.R. 368, 373 (9th Cir. BAP 2004), *aff'd*, 212 F. App'x 589 (9th Cir. 2006) (citing *Murray v. Bammer (In re Bammer)*, 131 F.3d 788, 791-92 (9th Cir. 1997) (en banc)).

When reviewing a bankruptcy court's determination of an exception to discharge claim under § 523, we review its findings of fact for clear error and its conclusions of law de novo. *See Oney v. Weinberg (In re Weinberg)*, 410 B.R. 19, 28 (9th Cir. BAP 2009). "Whether a requisite element of a § 523(a)(2)(A) claim is present is a factual determination reviewed for clear error." *Tallant v. Kaufman (In re Tallant)*, 218 B.R. 58, 63 (9th Cir. BAP 1998) (citing *Anastas v. Am. Sav. Bank (In re Anastas)*, 94 F.3d 1280, 1283 (9th Cir. 1996)).

"De novo review requires that we consider a matter anew, as if no decision had been made previously." *Francis v. Wallace (In re Francis)*, 505 B.R. 914, 917 (9th Cir. BAP 2014) (citations omitted).

The bankruptcy court's determinations concerning the debtor's intent

15

are factual matters reviewed for clear error. *Beauchamp v. Hoose (In re Beauchamp)*, 236 B.R. 727, 729 (9th Cir. BAP 1999). We give especially great deference to the bankruptcy court's determinations of witnesses' credibility. *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985) (stating that only the trial court "can be aware of variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said").

Factual findings are clearly erroneous if they are illogical, implausible, or without support in the record. *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1196 (9th Cir. 2010). "To be clearly erroneous, a decision must strike us as more than just maybe or probably wrong; it must . . . strike us as wrong with the force of a five-week-old, unrefrigerated dead fish." *Sepulveda v. Adams (In re Sepulveda)*, BAP No. CC-16-1226-FLKu, 2017 WL 1505216, at *4 (9th Cir. BAP Apr. 26, 2017) (quoting *Papio Keno Club, Inc. v. City of Papillion (In re Papio Keno Club, Inc.)*, 262 F.3d 725, 729 (8th Cir. 2001)). If two views of the evidence are possible, the trial judge's choice between them cannot be clearly erroneous. *Anderson*, 470 U.S. at 573-75.

## DISCUSSION

### A. The bankruptcy court did not err in holding that API failed to establish the mental state required by §§ 727(a)(2)(A), (a)(2)(B), (a)(4), and 523(a)(2).

We find no clear error in the bankruptcy court's determination that

Mr. Davis lacked the requisite intent under §§ 727(a)(2), (a)(4), or 523(a)(2). Therefore, all of API's other non-procedural arguments are inconsequential.

Mental state is an element of all three of the statutes API relies upon. Section 727(a)(2) provides that the debtor is entitled to a discharge unless:

> (2) the debtor, **with intent to hinder, delay, or defraud a creditor or an officer of the estate** charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed –
>
> (A) property of the debtor, within one year before the date of the filing of the petition; or
>
> (B) property of the estate, after the date of the filing of the petition[.]

§ 727(a)(2) (emphasis added). "A party seeking denial of discharge under § 727(a)(2) must prove two things: '(1) a disposition of property, such as transfer or concealment, and (2) a **subjective intent** on the debtor's part to hinder, delay or defraud a creditor through the act [of] disposing of the property.'" *In re Retz*, 606 F.3d at 1200 (emphasis added) (quoting *Hughes v. Lawson (In re Lawson)*, 122 F.3d 1237, 1240 (9th Cir. 1997)).

Section 727(a)(4)(A) provides for denial of discharge if "the debtor **knowingly and fraudulently**, in or in connection with the case . . . made a false oath or account[.]" § 727(a)(4)(A) (emphasis added). "To prevail on [a

17

§ 727(a)(4)(A)] claim, a plaintiff must show, by a preponderance of the evidence, that: '(1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made **knowingly**; and (4) the oath was made **fraudulently**.'" *In re Retz*, 606 F.3d at 1197 (emphases added) (quoting *Roberts v. Erhard (In re Roberts)*, 331 B.R. 876, 882 (9th Cir. BAP 2005)).

Section 523(a)(2)(A) excepts from discharge debts resulting from "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." A creditor seeking to except a debt from discharge based on fraud bears the burden of establishing each of five elements: (1) misrepresentation, fraudulent omission or deceptive conduct; (2) **knowledge** of the falsity or deceptiveness of such representation(s) or omission(s); (3) an **intent** to deceive; (4) justifiable reliance by the creditor on the representations or conduct; and (5) damage to the creditor proximately caused by its reliance on such representation(s) or conduct. *See Ghomeshi v. Sabban (In re Sabban)*, 600 F.3d 1219, 1222 (9th Cir. 2010); *In re Weinberg*, 410 B.R. at 35.

API has failed to demonstrate that any of the court's findings about Mr. Davis' mental state were clearly erroneous.

API says that Mr. Davis fraudulently transferred or concealed property under § 727(a)(2), including D&S Homes' shares and the Valerio Street Property. As to § 727(a)(4), API contends that Mr. Davis had

18

fraudulent intent when he made false oaths concerning his possession of financial documents, his valuation of his assets in his bankruptcy documents, the dilution of D&S Homes' shares, and various other properties and entities. The bankruptcy court properly rejected each of these arguments.

In the first place, the bankruptcy court correctly found that API did not even prove that all of these statements were false. For example, API says that Mr. Davis uttered a false oath when he stated, in a discovery response, that he had no financial statements for D&S Homes, but he produced Exhibit G at trial. But Mr. Davis' attorney represented that he had received Exhibit G only recently, and API offered no contrary evidence. Similarly, API argues that Mr. Davis lied when he valued his interest in his business entities at zero or unknown, but API offered no evidence that any of these entities had any value.

More importantly, the bankruptcy court did not commit clear error when it found that Mr. Davis lacked the required intention and knowledge under § 727. The court weighed Mr. Davis' denials against the circumstantial evidence offered by API and found Mr. Davis' testimony more persuasive.

Similarly, the bankruptcy court did not clearly err when it found that Mr. Davis lacked knowledge of falsity and intent to deceive under § 523(a)(2). The bankruptcy court considered the testimony of Mr. Davis,

the Ludlows, and Mr. Poles and found that Mr. Davis did not know that the nondisclosure of T.O.'s license status was wrongful, did not have an intent to deceive API, and did not have reason to believe that the as-built survey was unreliable. We again find no clear error in the bankruptcy court's factual determinations as to Mr. Davis' knowledge and intent.

Accordingly, because API failed to establish the requisite elements of knowledge and intent, the bankruptcy court did not err in rejecting API's §§ 727(a)(2), (a)(4), and 523(a)(2) claims.

**B. The bankruptcy court correctly followed the law of issue preclusion.**

API correctly points out that issue preclusion (formerly known as collateral estoppel) applies in proceedings under §§ 727 and 523. It argues that the bankruptcy court improperly ignored the state court's findings and that these findings were binding on the bankruptcy court. API's reliance on the state court findings is misplaced.

Issue preclusion prevents relitigation of all "issues of fact or law that were actually litigated and necessarily decided" in a prior proceeding, regardless of the claim to which they relate. *Segal v. Am. Tel. & Tel. Co.*, 606 F.2d 842, 845 (9th Cir. 1979). California law governs the preclusive effect of the state court's judgment. *See Harmon v. Kobrin (In re Harmon),* 250 F.3d 1240, 1245 (9th Cir. 2001); *see also* 28 U.S.C. § 1738 (federal courts must give "full faith and credit" to state court judgments).

In California, application of issue preclusion requires that: (1) the issue sought to be precluded from relitigation is identical to that decided in a former proceeding; (2) the issue was actually litigated in the former proceeding; (3) the issue was necessarily decided in the former proceeding; (4) the decision in the former proceeding is final and on the merits; and (5) the party against whom preclusion is sought was the same as, or in privity with, the party to the former proceeding. *Lucido v. Super. Ct.*, 51 Cal. 3d 335, 341 (1990). Additionally, California courts may give preclusive effect to a judgment "only if application of preclusion furthers the public policies underlying the doctrine." *In re Harmon*, 250 F.3d at 1245 (citing *Lucido*, 51 Cal. 3d at 342-43).

California law recognizes that courts always have discretion to deny preclusive effect to any judgment: "In California, issue preclusion is not applied automatically or rigidly, and courts are permitted to decline to give issue preclusive effect to prior judgments in deference of countervailing considerations of fairness." *Lopez v. Emergency Serv. Restoration, Inc. (In re Lopez)*, 367 B.R. 99, 108 (9th Cir. BAP 2007) (citations omitted). Therefore, API's repetitive claim that the bankruptcy court was "bound" by the state court's findings is false.

Further, API merely assumes that issue preclusion applies and neglects to address the individual elements. It fails to establish that the issues in the State Court Action were identical to the issues before the

21

bankruptcy court. It is clear that none of the state court's findings as to breach of contract or alter ego cover the fraudulent intent required by §§ 727 or 523; indeed, the fraud claims were scheduled to be tried in Phase Three. Although the state court was harshly critical of Mr. Davis' conduct, it made no finding sufficiently precise to preclude litigation of the intent and knowledge issues under §§ 727 and 523.

Similarly, API fails to show that the state court necessarily decided the issues to be precluded. It contends that the state court found fraud for the purposes of determining Mr. Davis' alter ego status. But alter ego is a remedy, not a substantive claim. *Leek v. Cooper*, 194 Cal. App. 4th 399, 418-19 (2011) ("A claim based upon an alter ego theory is not itself a claim for substantive relief. It is a procedural device by which courts will disregard the corporate entity in order to hold the alter ego individual liable on the obligations of the corporation."). As such, the alter ego determination under California law involves a weighing of factors. *See GEC US 1 LLC v. Frontier Renewables, LLC*, No. 16-CV-1276 YGR, 2017 WL 605070, at *5 (N.D. Cal. Feb. 15, 2017) (listing eighteen nonexclusive factors); *Greenspan v. LADT, LLC*, 191 Cal. App. 4th 486, 513 (2010) ("No single factor is determinative, and instead a court must examine all the circumstances to determine whether to apply the doctrine."). An alter ego holding does not require fraud: "In the state of California fraud is not required in order to invoke the alter ego theory." *Sequoia Prop. & Equip. Ltd. P'ship v. United*

22

*States*, No. CV-F 97-5044 OWW SMS, 1998 WL 471643, at *3 (E.D. Cal. May 13, 1998) (citing *U.S. Fire Ins. Co. v. Nat'l Union Fire Ins. Co. of Pitt.*, 107 Cal. App. 3d 456, 470 (1980)). Stated simply, the state court did not necessarily have to decide fraud issues in either Phase One or Phase Two.

Instead, API appears to argue that the bankruptcy court was prohibited from making **any** adverse findings against API, because the state court found during Phase One that API "did everything it was supposed to do under the contract" and "did nothing wrong in their dealings with the defendants." These general Phase One findings pertain to breach of contract, foreclosure on mechanic's lien, and quantum meruit, but not fraud. A blanket statement that API performed under the Subcontract and did "nothing wrong" in the context of breach of contract does not relate to the elements of fraud under § 523(a)(2)(A).

## C. The bankruptcy court did not err in allowing Mr. Davis to refresh his recollection with Exhibit G.

API argues that the bankruptcy court erred in allowing Mr. Davis to refresh his recollection with Exhibit G during the § 727 Trial.

"Under Federal Rule of Evidence 612, a witness may use a writing to refresh his or her recollection only if (1) the witness requires refreshment, and (2) the writing actually refreshes the witness's memory." *United States v. Carey*, 589 F.3d 187, 190 (5th Cir. 2009). "[T]he admissibility of testimony accompanied by a Rule 612 refreshment does not depend upon the source

of the writing, the identity of the writing's author, or the truth of the writing's contents, for '[i]t is hornbook law that any writing may be used to refresh the recollection of a witness.'" *Id.* at 191 (citation omitted). The Ninth Circuit agrees that "[t]he federal rule recognizes few if any limitations upon the kind of material that may be used to refresh recollection . . . ." *Johnston v. Earle*, 313 F.2d 686, 688 (9th Cir. 1962).

API argues that Mr. Davis could not use Exhibit G to refresh his memory because it must have been a fabricated document, there was handwriting on the document, and there was no foundation as to the handwriting. But "even inadmissible evidence may be used to refresh a witness's recollection." *Fraser v. Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003) (citations omitted). Even assuming the document was fabricated (and API did not prove that it was), the bankruptcy court did not admit its contents or the handwritten notes; it only allowed Mr. Davis to use the document to refresh his recollection as to how he valued his business entities.

API further complains that it was "unable to properly prepare" and was "surprised" when the bankruptcy court permitted Mr. Davis to utilize Exhibit G. It contends that Mr. Davis did not produce Exhibit G during discovery and testified that he had no financial documents. At trial, Mr. Davis' counsel explained that he had just recently received the document from a third party. Further, API's claim of "surprise" is disingenuous: Mr. Davis had included Exhibit G in his list of trial exhibits,

and the parties stipulated before trial that they had exchanged copies of all exhibits.[5] As the bankruptcy court pointed out, if API had any concern about Exhibit G, it should have sought to exclude Exhibit G through a pretrial motion in limine. It failed to do so. The bankruptcy court did not deny API due process.[6]

**D.    The bankruptcy court did not err in proceeding with the § 523 Trial before the state court adjudicated Phase Three.**

API argues that the bankruptcy court's decision to terminate the stay of the adversary proceeding and try the § 523 claims without waiting for the state court was erroneous and violated its constitutional rights.

But API did not object to, and in fact acquiesced in, the court's decision to proceed. Shortly before the court lifted the stay in April 2017, API filed a status report indicating that it would be ready for trial "[e]ither at the conclusion of pending State Court Fraud litigation **or earlier at the**

---

[5] At oral argument, API's counsel insisted that he had never seen Exhibit G before trial and was not given a chance to examine it. The record shows otherwise. The parties' Second Amended Joint Pretrial Stipulation and Order filed on November 7, 2014 (drafted by API) provides, "Attached is a list of exhibits intended to be offered at the trial by the Plaintiff and the Defendant . . . . The parties have exchanged copies of all exhibits." Under "Defendant's Exhibits," the seventh exhibit listed "The D&S Homes balance sheet dated December 31, 2007." This exhibit corresponds with the Exhibit G used at the § 727 Trial.

[6] We reject Mr. Davis' argument that API waived its challenge to Exhibit G when it failed to object before the trial court. Although API initially objected only on the bases of hearsay and lack of foundation, it later renewed its objection, eventually arguing that it was improper to use Exhibit G to refresh Mr. Davis' recollection.

**direction of the Bankruptcy Court**." (Emphasis added.) It summarized the delays in the State Court Action and concluded, "[API] respectfully requests that the trial of the instant adversary proceeding immediately follow trial in Phase III of the State Court Action referenced above, **or that the Court in its discretion schedule trial of this matter at an earlier date**." (Emphasis added.) API waived any objection to the bankruptcy court proceeding with the § 523 Trial.

API additionally misunderstands the law. It argues that the bankruptcy court infringed its Seventh Amendment right to a jury trial, because the state court would have held a jury trial but the bankruptcy court did not.

API is patently mistaken. In *Hashemi v. American Express Travel Related Services Co. (In re Hashemi)*, 104 F.3d 1122 (9th Cir. 1996), *as amended* (Jan. 24, 1997), the Ninth Circuit held in a § 523(a)(2)(A) case that "[a]ctions to determine the nondischargeability of debts . . . are equitable in nature. . . . Bankruptcy litigants therefore have no Seventh Amendment right to a jury trial in dischargeability proceedings." *Id.* at 1124 (citations omitted). "[A] bankruptcy litigant waives his right to a jury trial in proceedings 'vital to the bankruptcy process of allowance and disallowance of . . . claims.'" *Id.* at 1125 (quoting *Benedor Corp. v. Conejo Enters., Inc. (In re Conejo Enters., Inc.)*, 96 F.3d 346, 354 n. 6 (9th Cir. 1996)). Accordingly, the § 523 claims were not subject to the Seventh Amendment or state law guaranteeing a jury trial.

This argument also rests on an unstated premise that is false. The implicit premise is that if there are overlapping proceedings in the state court and the bankruptcy court, and a party has a right to a jury trial in the state court but not in the bankruptcy court, the Seventh Amendment requires the bankruptcy court to stay its hand until the state court proceeding is complete. API cites no authority for this proposition, and we are aware of none.

Additionally, API complains that the court violated its due process rights when it sua sponte reversed its decision to stay the adversary proceeding. But the bankruptcy court always retains the power to control its own docket. *See Mediterranean Enters., Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1465 (9th Cir. 1983) ("The trial court possesses the inherent power to control its own docket and calendar."). It may "find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it[.]" *Id.* (quoting *Leyva v. Certified Grocers of Cal., Ltd.*, 593 F.2d 857, 863 (9th Cir. 1979)). Conversely, a stay is not warranted if its imposition is inefficient or unfair to a party.

In this case, by the time the bankruptcy court decided to proceed with the § 523 Trial, seven years had passed since the petition date in 2010, and over two years had passed since the bankruptcy court issued the § 727

Judgment in 2014.[7] The bankruptcy court was within its discretion to avoid any further delay in the adjudication of the remaining claims.

### E. The bankruptcy court did not err in finding Mr. Davis credible and finding API's witnesses not credible.

API argues that the bankruptcy court erred in determining the credibility of the witnesses. It contends that Mr. Davis cannot be credible because he lied by failing to disclose assets, and the court threatened to sanction him for failing to comply with court orders. Conversely, it argues that the Ludlows and Mr. Poles were completely believable.

We afford the bankruptcy court great deference in its determinations of witness credibility. As the United States Supreme Court explained, when evaluating factual findings, "we give singular deference to a trial court's judgments about the credibility of witnesses. That is proper, we have explained, because the various cues that 'bear so heavily on the listener's understanding of and belief in what is said' are lost on an appellate court later sifting through a paper record." *Cooper v. Harris*, 137 S. Ct. 1455, 1474 (2017) (citations omitted). It has further instructed that an attack on credibility determinations rarely succeeds, because "when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not

---

[7] Mr. Davis represents that Phase Three is still pending in the State Court Action.

28

internally inconsistent, can virtually never be clear error." *Anderson*, 470 U.S. at 575; *see* Fed. R. Civ. P. 52(a)(6) (incorporated by Fed. R. Bankr. P. 7052).

In the present case, the bankruptcy court was presented with conflicting testimony by Mr. Davis and API's witnesses. The bankruptcy court judged Mr. Davis' testimony to be credible, but did not believe API's witnesses. We cannot disturb these credibility findings.

**F.      The bankruptcy court did not err in rejecting API's expert witness' testimony.**

Finally, API contends that the bankruptcy court impermissibly discounted Mr. Poles' expert testimony. It argues that the bankruptcy court violated API's due process rights and improperly acted as an expert witness to counter Mr. Poles.

API's argument is nonsensical. The court properly performed its duty as the gatekeeper of the record and the finder of fact. It correctly rejected Mr. Poles' expert opinion regarding Mr. Davis' intent and mental state. Nothing in the record suggests that Mr. Poles had any "scientific, technical, or other specialized knowledge [that would] help the trier of fact" peer into Mr. Davis' mind and ascertain his subjective intentions. *See* Fed. R. Evid. 702.

Additionally, a court is not obligated to blindly accept expert testimony, even if uncontroverted. The Ninth Circuit has acknowledged

that "[e]xpert testimony . . . **is not conclusive upon the trier of fact, even though unimpeached and uncontradicted**, since the trier may apply his own experience or knowledge in determining how far to follow the expressed opinion." *Sec.-First Nat'l Bank of L.A. v. Lutz*, 322 F.2d 348, 355 (9th Cir. 1963) (emphasis added); *see Wilbur-Ellis Co. v. M/V Captayannis "S"*, 451 F.2d 973, 974 (9th Cir. 1971) (following Supreme Court dictate that "the court is not bound to accept uncontroverted testimony at face value if it is improbable, unreasonable or otherwise questionable").

In short, the bankruptcy court did not err when it did not credit Mr. Poles' expert opinions.

## CONCLUSION

The bankruptcy court did not err. We AFFIRM.